Filed 2/1/21  P. v. Luck CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C087056 |
| Plaintiff and Respondent, | (Super. Ct. No. P17CRF0268) |
| v. | |
| LAWRENCE LELAND LUCK, | |
| Defendant and Appellant. | |

Following a trial, a jury found defendant Lawrence Leland Luck guilty of one count of committing a lewd act upon a child under the age of 14 years and found true a special allegation that defendant engaged in substantial sexual conduct with the victim. Defendant's sole contention on appeal is that the trial court erred in ruling that it would permit the prosecutor to cross-examine defendant's wife, if she were called as a defense witness, about her reaction to prior accusations of sexual abuse against defendant. We will affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

1

Defendant was charged with committing a lewd act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a); count 1)[1] and oral copulation or sexual penetration with a child under 10 years (§ 288.7, subd. (b); count 2). It was further alleged that defendant engaged in substantial sexual conduct with the victim. (§ 1203.066, subd. (a)(8)).

Defendant and S.L. were Jane Doe's grandparents and the parents of Jane's mother, L.D.[2] When Jane was about 4 years old, she and L.D. moved into defendant's and S.L.'s house in Salinas for about a year. In 2001 or 2002, when Jane was 8 years old, she moved with her siblings, L.D., and L.D.'s husband, G.D., to Placerville. L.D. asked her parents to move closer to be near her growing family. Defendant and S.L. moved in with L.D.'s family for nine months while their home was being built. During the nine months that defendant and S.L. lived there, L.D. and G.D. shared a bedroom, defendant and S.L. shared another bedroom, and each of the three children had their own bedroom.

Years later, in November 2015, Jane unexpectedly came home from college to talk to L.D. and G.D. She disclosed to L.D. and G.D. that defendant had molested her years before when he lived with the family. The family decided to file a police report.

Sergeant Anthony Prencipe interviewed Jane after she made her police report. After interviewing Jane, Sergeant Prencipe had her make a pretext call to defendant accusing him of molesting her. The goal was to obtain an admission of the abuse. Defendant denied the allegations during this pretext call. A week later, L.D. made another pretext call to defendant. He hung up on her first call but answered a second call 10 minutes later. In the second call, defendant admitted to L.D., "One morning I get up, she crawled over next to me and I just put my hand on her crotch. Simple as that, okay.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] The record refers to the victim by the pseudonyms Jane Doe or Jane. We will adopt this pseudonym and refer to other members of the family by their initials.

2

And beyond that, whoever else is fucking dreaming up is a bunch of crap." Defendant maintained that he did not have a problem: "It was—it happened . . . 15 or 16 years ago. That's all. You think I need to go to counseling for. It's just something stupid that had happened, simple as that." Defendant then claimed that he planned to leave S.L. and move away so that the family would not have to deal with him. He went on, "I can't feel any more guilty about it than now, and that's the end of it. I don't want to talk about it anymore. I'm—I'll just—I'm out of everybody's hair, simple as that." Defendant asked L.D. to keep this information to herself.

At trial, Jane testified that prior to disclosing the abuse to her family, she told a friend in high school about what happened. She explained she did not want to tell her family out of fear that the family would break apart. The abuse occurred when Jane was 8 and at a time when defendant lived in the same house as her. In her first memory, she woke up to someone touching her beneath her clothes; she could feel fingernails, large hands, and she was not able to move. Jane could not associate a face with the abuser in this memory, but she had clear memories that someone touched her vagina. In her second memory, Jane woke up to a man holding her hands on his penis and moving them. She testified that it was her grandfather, defendant. But she conceded that she told Sergeant Prencipe during her interview that she could not remember seeing the abuser's face in this incident. She explained that she was "sorting out [her] memories with the detective at that time."

In her third memory, Jane was awake when defendant came into her room, but she pretended to be asleep. She saw that it was her grandfather. By this point, Jane had begun wearing multiple pairs of sweatpants, tying them so tight that she cut off her circulation. She recalls it was a "struggle" for defendant to get his hands inside her pants, but she could not recall what else happened during that incident. Her mind went "black."

Jane testified that she had clear memories of defendant touching and penetrating her vagina during at least one of these incidents. However, Sergeant Prencipe testified

3

that during her interview, Jane said she was not sure whether she felt any penetration during these incidents. Sergeant Prencipe called Jane after the initial interview to clarify whether she remembered any penetration, and she told him then that she recalled that defendant had put one finger in her vagina during one of the incidents. In another follow-up call, Jane said that after going to therapy, she remembered multiple instances of digital penetration.

Defense counsel cross-examined Jane regarding her inconsistent statements. Counsel asked Jane about her initial statement during her interview with Sergeant Prencipe, inquiring whether she told him at the time that she did not have any memory of digital penetration. She initially responded that she did not remember whether she told the sergeant about it during the interview but then said that she did recall telling him that she felt fingernails. Counsel also asked Jane whether it was true that she told Sergeant Prencipe she did not see the perpetrator during the first two instances, which she conceded. Further, counsel asked whether it was true that she wasn't sure whether there was one or two people in the room during the second incident. Jane responded that she was "sorting out [her] memories" with the sergeant and conceded she told him that she believed her grandmother, S.L., was in the room during this incident and may have also touched her inappropriately. She did not make this claim at trial.

After Sergeant Prencipe testified, defense counsel announced its intention to call S.L. as a witness with a limited inquiry regarding "when she was in the room when these things happened" to Jane. The prosecutor responded that during an interview with Sergeant Prencipe, S.L. said she was aware of similar accusations against defendant from his daughter, K.N. S.L. was dismissive of those allegations during the interview, calling K.N. "crazy." She was similarly dismissive of Jane. The prosecutor further explained that S.L. was also aware of similar allegations made by defendant's sister against him, but again, "made a conscious choice to align herself with the defendant and against his accusers . . . ." The prosecutor thought this subject was "ripe for cross-examination" in

4

order to impeach S.L.'s credibility: "I don't know how we get around the fact that she has been made aware of now for three decades similar allegations against this man and chosen not to believe them."

Defense counsel responded that S.L.'s belief that defendant's accusers were lying was irrelevant to the issues at trial, especially since there was no evidence before the jury regarding the other accusations. The defense clarified that it only wanted to elicit testimony from S.L. to establish that she was not in the room during an incident of Jane's sexual abuse to show Jane's inconsistent statements. The prosecutor responded that S.L.'s testimony would create a credibility battle: "If you believe [S.L.], then you can't believe this victim and you must acquit this defendant." Thus, the prosecutor felt that he should be allowed to attack S.L.'s credibility. Defense counsel responded that if S.L. testified that she was aware of the other accusations, the jury would "have no way to assess her credibility whether she's making a good decision and that's because there's no credibility to the allegations or not."

The trial court observed that whether or not S.L. was in the room when these events occurred was not very probative of any issue in the case outside of impeaching Jane. The court reasoned that if S.L. was called to impeach Jane's credibility, the prosecution should be allowed to impeach S.L.'s credibility and motive with her past reactions to other similar allegations. The court therefore agreed to allow this line of cross-examination should defense counsel call S.L. as a witness regarding Jane's credibility. The defense did not call S.L. to testify as a result of the ruling.

The trial court dismissed count 2 on the prosecutor's motion before the case was submitted to the jury (§ 1385). The jury convicted defendant on count 1 and found the special allegation true. The court sentenced defendant to a prison term of six years, the middle term.

## DISCUSSION

5

Defendant contends that the trial court erred in ruling that the prosecution could impeach S.L. by inquiring about her knowledge of and reactions to uncharged allegations of prior inappropriate sexual conduct against defendant. He characterizes the proposed line of questioning as designed to elicit a lay opinion. He contends the error prejudiced him because he was not able to call S.L. as a defense witness. We conclude there was no prejudicial error.

Evidence impeaching a witness's credibility is relevant. Evidence Code section 780 defines what a jury may consider to appraise the credibility of a witness: "[T]he court or jury may consider . . . any matter that has any tendency in reason to prove or disprove the truthfulness of [a witness's] testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive." "As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

We conclude that we need not reach the issue of whether the trial court abused its discretion in ruling that the prosecutor's proposed line of questioning S.L. was admissible because even if the trial court erred in its ruling, any error was harmless. Defendant claims that the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711], applies because the error undermined his ability to present a defense and was "inextricably intertwined with the outcome." The People counter that the trial court's evidentiary ruling did not infringe on defendant's right to present a defense, and that the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) applies. Under *Watson*, we determine

6

whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id.* at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

" 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. . . .' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Defendant presented a vigorous defense based on Jane's inconsistent statements, and defense counsel confronted and cross-examined her credibility on her inconsistencies. Thus, we conclude that the court's evidentiary ruling that caused the defense not to call a witness to impeach the victim's credibility cannot be said to have violated defendant's right to present a defense. Thus, any error in the evidentiary ruling is subject to the *Watson* harmless error standard.

Notwithstanding the efforts of the defense to establish that Jane was not credible based on her inconsistent statements, we conclude that the evidence established defendant's guilt. During the second pretext call, defendant admitted to L.D., "One morning I get up, she crawled over next to me and I just put my hand on her crotch. Simple as that, okay. And beyond that, whoever else is fucking dreaming up is a bunch of crap." Defendant characterizes this statement as only an admission of "inadvertent touching" without lewd intent. Not so. Defendant did not claim that the touching was accidental or inadvertent at any time during the pretext call. Indeed, he admitted he felt

guilty about what he had done to Jane. He admitted it happened 15 or 16 years prior. While Jane's testimony and police interview had several inconsistencies, and she had gaps in her memory about portions of the events, describing it as "go[ing] black" in her mind, she was adamant that her grandfather touched her vagina on at least one occasion. This is consistent with defendant's admission, and this evidence is sufficient to support the verdict for one count of committing a lewd act upon a child under the age of 14 years. Accordingly, we conclude that even if the trial court abused its discretion in ruling that the prosecutor could cross-examine S.L. about her knowledge of and reactions to prior allegations of sexual abuse against defendant, there is no reasonable probability that had she testified without being cross-examined regarding her knowledge of other acts of misconduct, the jury would have reached a result more favorable to defendant. (*Watson, supra*, 46 Cal.2d at pp. 835-836.)

## DISPOSITION

The judgment is affirmed.

/s/_____
HOCH, J.

We concur:

/s/_____
HULL, Acting P. J.

/s/_____
MAURO, J.

8